UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OTHERS FIRST, INC.,

        Plaintiff,

CASE NO. 14-CV-12066

v.                                          HONORABLE GEORGE CARAM STEEH

THE BETTER BUSINESS BUREAU OF
EASTERN MISSOURI AND SOUTHERN
ILLINOIS,

        Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION TO DISMISS (DOC. #7) AND
<u>DISMISSING CASE WITHOUT PREJUDICE</u>**

       This is a tortious interference and defamation case in which Defendant The Better Business Bureau of Eastern Missouri and Southern Illinois (the "BBB") allegedly published a defamatory article about Plaintiff Others First, Inc. ("Others First") on its website. Others First is a Michigan non-profit corporation. Others First filed this diversity action pursuant to 28 U.S.C. § 1332 against the BBB, a Missouri non-profit corporation. The BBB filed a motion to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure arguing that the court lacks personal jurisdiction over it, or, alternatively, that the action should be transferred to the Eastern District of Missouri, pursuant to 28 U.S.C. § 1404(a), as a more convenient venue. The motion has been fully briefed and a hearing was held on October 30, 2014. Because exercising personal jurisdiction over the BBB would offend traditional notions of fair play and substantial justice, the BBB's motion is granted as set forth below.

## BACKGROUND

Others First, a non-profit charity principally based in Rochester Hills, Michigan, solicits donations of cash and cars nationwide under multiple assumed names including Cars Helping Veterans, Cars to Help Kids, and Cars Helping Pets, among other names. Rick Frazier ("Frazier") is Others First's agent[1] and he resides in the state of Michigan.

At some point in June, 2011, the BBB learned that Others First was soliciting consumers in St. Louis, Missouri, for car donations. The BBB, for reasons not explained by either party, began an investigation of Others First and Frazier. As part of the investigation, on June 29, 2011, Bill Smith ("Smith") from the BBB called David Kennedy ("Kennedy"), a Michigan resident and the then-Chairman of the Board of Directors (the "Board") of Others First, to obtain information about Others First. Particularly, Kennedy wanted information about the election of a gentleman named Maurice Banks to Others First's Board, and he also wanted to know about Others First hiring a company controlled by Frazier to act as a consultant for Others First, seemingly a conflict of interest. Further, Kennedy requested a copy of Other First's contracts and tax returns for the year ending 2010.

The following day, on June 30, 2011, Smith spoke with Other First's attorney, Gregory Yatooma ("Yatooma"), to address his questions. The exact nature of the conversation between Smith and Yatooma is not explained in the papers. Smith memorialized the conversation he had with Yatooma in an e-mail sent to Yatooma on July

---

[1] Others First does not explain what position Frazier holds other than stating that he is an "agent."

5, 2011.[2]  Kennedy responded to Smith's e-mail on July 12, 2011; neither Yatooma nor Kennedy received any further response from Smith.

On August 2, 2011, the BBB posted a press release to its website, www.stlouis.bbb.org,[3] advising consumers to be cautious when dealing with Others First and Frazier.  In addition to posting the release to its website, BBB summarized the release in its printed newsletter sent to consumers, businesses and news media in eastern Missouri and southern Illinois.  The complaint alleges that, prior to publishing the release to its website, the BBB solicited Yatooma's comments, and that Yatooma informed the BBB that the information contained in the release was factually inaccurate and that its publication would damage Others First.  The press release reads, in relevant part:

> BBB Urges Caution On Others First Car Donation Programs
> BBB is advising consumers to be cautious when dealing with Detroit area businessman Rick Frazier and Others First, a charity that has been soliciting car donations in the St. Louis area.
> August 02, 2011
>
> ***St. Louis, Mo., August 2, 2011 -*** A national charity that is seeking car donations in the St. Louis area has ties to a Detroit area businessman who has been criticized for alleged improprieties in running similar programs, the Better Business Bureau (BBB) warns.
>
> The BBB advises caution when dealing with **Rick Frazier** and the charity **Others First**.  Others First is a two-year-old nonprofit that raises money for causes, such as disabled and homeless veterans, cancer research, children and animals.
>
> In recent months, Others First has mailed solicitations to St. Louis area consumers on behalf of an affiliated charity, **Cars Helping Veterans (www.carshelpingveterans.org)**.  Advertising flyers mailed throughout the

---

[2] The e-mail is not part of the record.

[3] BBB's website has since changed to www.bbb.org/stlouis and the press release remains posted on the current website.

bi-state area say the vehicle donations go to help veterans of the U.S. Armed Forces.

Michelle L. Corey, BBB President and CEO, said the BBB is concerned about Frazier's controversial history with other charitable vehicle donation programs. "Mr. Frazier's past problems are reason to be cautious about his newest venture," she said.

Corey also said it appears that a former associate of Frazier, and perhaps even Frazier himself, may have potential conflicts of interest over their involvement in the Others First donation program.

Frazier and former coworker Maurice E. Banks recently signed potentially lucrative contracts to run vehicle donation programs for the charity. Frazier is described in the media and on the website of an Others First charity as the charity's founder, although he denies that role. Banks is the previous treasurer of Others First.

Frazier's **Charity Funding** and Banks' **Charity Car Brokers** are named as fundraising consultants for Others First in several states. Contracts in Illinois and North Carolina show Others First has agreed to pay Banks and Charity Car Brokers 30 percent of the net profits from the program.

Frazier's problems in the charity arena have been the subject of news reports. The *Detroit Free Press* reported in 1998 that the Mother Waddles Perpetual Mission charity in Detroit accused Frazier of several improprieties in that donation program. The newspaper also raised questions about Frazier's involvement with the Charity Motors donation program in Detroit.

Last year, the Virginia-based Military Order of the Purple Heart Foundation alleged in a court suit that an audit found widespread problems with Frazier's role in that program, including self-dealing, illegal practices and destruction of incriminating records. Frazier denied the claims.

About two years ago, Frazier began operating a car donation program for Vietnam Veterans of America in about a dozen states. That organization has said it is satisfied with the program.

Records on file with Michigan show that Others First was registered as a nonprofit in September 2009. The incorporator was listed as David S. Kennedy of West Bloomfield, Mich.

In the months that followed its incorporation, Others First registered several assumed names, including: **Cars Helping Veterans, Cars for Research,**

**Cars Fighting Cancer, Cars for Christ, Cars to Help Kids, Cars Helping Pets** and **Mikie's Minutes.**

Others First is registered to do business in at least eight states - Missouri, Illinois, New York, North Carolina, Washington, Colorado, Arizona and Utah - although its various websites say it accepts donations from all 50 states.

The BBB could not determine how much Others First has raised through its vehicle donation program or how much Frazier and Banks have received for running the program.  But financial information made public by the Military Order of the Purple Heart Foundation two months ago shows that foundation made $15.9 million from its car donation program in the 11 months ending June 30, 2010, with most of that coming from five states.

Frazier and Banks did not respond to a BBB request for interviews. Kennedy, president of Others First, said in a letter to the BBB that Frazier has never been a board member or officer of Others First and any reference to him as founder is "unauthorized and misguided."  He added that because Banks resigned from the Others First board before signing contracts with the charity, "there never was a conflict of interest."

The press release then provided consumers with "tips" to keep in mind when considering donating a vehicle to charity.  In addition, the release listed contact information for the BBB's President and CEO, Vice President of Communications and Charity Review Director.

Others First avers that the article is false, inaccurate and misleading, and that it was posted on the BBB's website at the behest of a competing charity or car donation program in order to disadvantage Others First and Frazier.  Since the article was posted on the BBB's website in 2011, Others First says that the BBB has used Search Engine Optimization (SEO)[4] techniques causing the article to appear at the top of the results page on Google when running a search for "Others First."

---

[4] As explained in the affidavit of Kenneth Smith, the president and CEO of Ocean State Software, SEO is a technique used to ensure that an Internet posting remains displayed in Google search results.

In March, 2014, Others First's attorney contacted the BBB asking it to remove the article from its website and to stop republishing the article using SEO techniques. In addition, Others First hired a consultant to assist in removing the article from the Internet, to no avail. The BBB did not remove the article which led to the filing of this lawsuit. Others First claims tortious interference and defamation, and it seeks an injunction requiring the BBB to remove the article from its website and refrain from any further publication of the article.

Now before the court is the BBB's motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) on the grounds that the court cannot exercise personal jurisdiction over the BBB. Alternatively, the BBB requests that the court transfer this action to the Eastern District of Missouri, a more convenient venue, pursuant to 28 U.S.C. § 1404(a). Others First opposes the motion and argues that the BBB has sufficient minimum contacts with the state of Michigan allowing the court to exercise specific jurisdiction over the BBB. In addition, Others First takes the position that this district is the appropriate venue for this action. The court's analysis is set forth below.

## STANDARD OF REVIEW

The burden is on the plaintiff to establish that personal jurisdiction exists. *Bird v. Parsons*, 289 F.3d 856, 871 (6th Cir. 2002). Because the court is deciding the issue of personal jurisdiction without first holding an evidentiary hearing, the facts are construed in the light most favorable to the plaintiff, the nonmoving party. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). The plaintiff "need only make a prima facie showing of jurisdiction." *Id.* (citation omitted). The plaintiff can meet this burden by " 'establishing with reasonable particularity sufficient contacts between [the defendant] and

the forum state to support jurisdiction.' " *Id.* (quoting *Provident Nat'l Bank v. California Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)). Where the facts proffered by the defendant conflict with those offered by the plaintiff, the court disregards the defendant's facts for purposes of ruling on the motion. *Id.* In the face of a properly supported motion for dismissal, however, the plaintiff "may not stand on [its] pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991).

## ANALYSIS

"A federal court's exercise of personal jurisdiction in a diversity of citizenship case must be both (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Neogen Corp.*, 282 F.3d at 888 (citing *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir. 1994)). Michigan's long-arm statute confers general jurisdiction over a corporation pursuant to Mich. Comp. Laws § 600.711 and limited jurisdiction pursuant to Mich. Comp. Laws § 600.715.[5] "Under Michigan's long-arm statute, the state's jurisdiction extends to the limits imposed by federal constitutional due process requirements and thus, the two questions become one." *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992).

**I. General Jurisdiction**

---

[5] Others First cites Mich. Comp. Laws § 600.705 as Michigan's limited jurisdiction long-arm statute. Section 600.705 applies to *individuals*, not corporations. Section 600.715 applies to corporations.

"Personal jurisdiction exists in two forms: 'general' or 'specific.' " *Cadle Co. v. Schlichtmann*, 123 F. App'x 675, 677 (6th Cir. 2005) (citing *Bird*, 289 F.3d at 873). General jurisdiction "exists over a defendant when his 'contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state.' " *Id.* (citation omitted). Others First does not argue that the BBB is subject to general jurisdiction in Michigan. Nor do the facts, when viewed in a light most favorable to Others First, establish that the BBB has "continuous and systematic" contacts with Michigan subjecting it to general jurisdiction. The operation of a website available to anyone over the Internet is insufficient to establish general jurisdiction. *Id.*

## II. Specific Jurisdiction

Specific jurisdiction, on the other hand, requires contacts with the forum state related to the case at hand. *Id.* The central inquiry in determining whether specific jurisdiction is authorized under the Due Process Clause is whether the defendant has sufficient "minimum contacts" with the state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations omitted).

To determine whether a defendant has sufficient minimum contacts with the state, the Sixth Circuit applies a three-part test:

> First, the defendant must purposefully avail [itself] of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

### A. Purposeful Availment

Turning to the first factor, the BBB argues that it did not purposefully avail itself to the privilege of acting in Michigan by virtue of posting a press release on its website available nationwide. The BBB cites *Calder v. Jones*, 465 U.S. 783 (1984) and *Zippo Manufacturing Co. v. Zippo DOT Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), cases relied on by the Sixth Circuit, to argue that the press release is not a sufficient website posting that amounts to purposeful availment in Michigan.

Others First disagrees. Others First argues that (1) the press release was aimed at a Michigan corporation and makes references to individuals residing in Michigan; and (2) the BBB solicited information from people in Michigan prior to publishing the press release on its website. This, along with the constant republication of the press release on the Internet through SEO techniques, amounts to purposeful availment, according to Others First.

Case law sets forth the relevant test for determining whether the court can assert personal jurisdiction over a defendant whose defamatory statements reach into the forum state. In *Calder v. Jones*, Shirley Jones, a California resident and television actor, brought a libel action against the *National Enquirer*, a Florida corporation with a national magazine publication, and two of its Florida employees (an author and an editor), for publishing an article about Jones in the magazine. 465 U.S. at 785–86. The Supreme Court held that although the defendants were Florida residents who published the story from Florida, they purposefully availed themselves to the privilege of acting in California because the allegedly libelous story concerned California activities, a California resident, and impugned the

professionalism of a television actor whose career was centered in California.  *Id.* at 788. In addition, the Court reasoned that "[t]he article was drawn from California sources, and the brunt of the harm, in terms both of [Jones's] emotional distress and the injury to her professional reputation, was suffered in California."  *Id.* at 788–89.  The Court, therefore, concluded that jurisdiction over the defendants was proper in California because the "effects" of their Florida conduct were felt in California.  *Id.* at 789 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980); Restatement (Second) of Conflicts of Law § 37).  This standard has become known as the *Calder* "effects test."

The Sixth Circuit interprets the *Calder* effects test narrowly, holding that "the mere allegation of intentional tortious conduct which has injured a forum resident does not, by itself, always satisfy the purposeful availment prong."  *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 552 (6th Cir. 2007) (citing *Scotts Co. v. Aventis S.A.*, 145 F. App'x 109, 113 n.1 (6th Cir. 2005)).  Although intentional tortious conduct " 'enhances' a party's other contacts with the forum state for purposes of a purposeful availment analysis," *id.* at 552–53, more connection to the forum state is required.  For example, in *Cadle Co. v. Schlichtmann*, 123 F. App'x 675, 676 (6th Cir. 2005), the Cadle Company, an Ohio-based debt collector, sued Jan Schlichtmann, a Massachusetts resident, to enforce a security interest it claimed to have on attorney fees owed by Schlichtmann.  In the course of defending himself, Schlichtmann established a website, *www.truthaboutcadle.com*, "to inform others of what he believed were the unlawful activities of Cadle in Massachusetts. . ."  *Id.*  Applying *Calder*, the Sixth Circuit held that Schlichtmann's actions in creating the website did not demonstrate purposeful availment in Ohio because the content on the website specifically referred to Cadle's activities in Massachusetts as opposed to directly

-10-

discussing Cadle's activities in Ohio. *Id.* at 679. Although the content on the website was about an Ohio resident, it did not concern Cadle's Ohio activities, nor was the content targeted or directed at Ohio readers as opposed to readers in other states. *Id.* Therefore, the Sixth Circuit determined that Schlichtmann's conduct did not constitute purposeful availment in Ohio.

The *Cadle* court cited another Sixth Circuit case, *Reynolds v. International Amateur Athlete Federation*, 23 F.3d 1110 (6th Cir. 1994), in which the court "determined that there was no personal jurisdiction over an international sports organization where it published a press release about the plaintiff, an athlete residing in Ohio, and his failure of a drug test" in Monaco. *Cadle*, 123 F. App'x at 679. In distinguishing the facts from *Calder*, the *Reynolds* court stated:

> First, the press release concerned Reynolds' activities in Monaco, not Ohio. Second, the source of the controversial report was the drug sample taken in Monaco and the laboratory testing in France. Third, Reynolds is an international athlete whose professional reputation is not centered in Ohio. Fourth, the defendant itself did not publish or circulate the report in Ohio; Ohio periodicals disseminated the report. Fifth, Ohio was not the "focal point" of the press release. The fact that the IAAF could foresee that the report would be circulated and have an effect in Ohio is not, in itself, enough to create personal jurisdiction. Finally, although Reynolds lost Ohio corporate endorsement contracts and appearance fees in Ohio, there is no evidence that the IAAF knew of the contracts or of their Ohio origin.

*Reynolds*, 23 F.3d at 1120.

This case is similar to *Cadle* and *Reynolds*. Although the press release is about a Michigan company, the focus and intended audience is St. Louis consumers. The BBB's press release does not target readers of the BBB's website in Michigan. At the outset of the release, the BBB informs consumers to be cautious when dealing with Frazier and Others First, "a charity that has been soliciting car donations in the *St. Louis area*." The

-11-

text of the release begins: "A national charity that is seeking car donations *in the St. Louis area*. . . ." The focal point of the press release is St. Louis; the release cautions St. Louis residents dealing with Others First in St. Louis, not in Michigan. While the article does make some mention of Others First's and Frazier's past dealings in Michigan, the references are incidental to the press release and provide only a background for the intended message to St. Louis residents. Viewed in its entirety, the press release does not constitute purposeful availment in Michigan. It was prepared for St. Louis consumers after Others First entered the St. Louis market. The fact that the press release has an effect on a Michigan corporation is not enough, standing alone, to confer personal jurisdiction over the BBB.

In addition, although Others First is incorporated in Michigan, it operates in multiple states, and does not identify itself as a Michigan company. Its websites make no reference to being a Michigan company.

Others First also argues that the BBB's actions in contacting Michigan residents by phone and e-mail prior to publishing the press release on its website amounts to purposeful availment. The court disagrees. The Sixth Circuit has explained that "[t]he use of interstate facilities such as the telephone and mail is a secondary or ancillary factor and cannot alone provide the minimum contacts required by due process." *Reynolds*, 23 F.3d at 1119 (internal quotation marks and citation omitted). The court must look to the "quality" of such contacts to determine whether they constitute purposeful availment. *Id.* Here, the phone calls and e-mails made by a representative of the BBB prior to posting the press release were ancillary to the posting of the release on the BBB's website. That the people the BBB contacted prior to publishing the press release were in Michigan at the time they were

contacted does nothing to show that the press release targets an audience of Michigan residents. As explained, the focal point of the press release concerned Others First's actions in St. Louis, not in Michigan. Under the *Calder* effects test, Others First has not established purposeful availment.

Although the *Calder* "effects test" is the "relevant strand of law dealing with whether the court can assert personal jurisdiction over defamatory publications which reach into the forum state," *Cadle*, 123 F. App'x at 678, the Sixth Circuit has also applied the "*Zippo* sliding scale" test[6] to determine whether the operation of a website on the Internet constitutes purposeful availment. *Bird*, 289 F.3d at 874–75. Determining whether the operation of a website constitutes purposeful availment "distinguishes between interactive websites, where the defendant establishes repeated online contacts with residents of the forum state, and websites that are passive, where the defendant merely posts information on the site." *Cadle*, 123 F. App'x at 678 (citations omitted). Interactive websites support a finding of personal jurisdiction while passive websites do not.

Here, the website falls between being interactive and passive. While the majority of the press release serves as a caution to consumers doing business with Others First in St. Louis, without any interaction from the consumer (seemingly passive), at the end of the website, the BBB lists the contact information of BBB agents and employees. *See Cadle*, 123 F. App'x at 678 (explaining that a website "falls between being interactive and passive, particularly because the website provides contact information, and arguably solicits support for the campaign against Cadle's activities."). Arguably, the contact information is an

---

[6] This test gets its name from *Zippo Mfg. Co.*, 952 F. Supp. 1119, *supra*.

invitation to consumers to contact the BBB about Others First's activities.  However, Others First "has not alleged that any interaction or exchange of information occurred between" the BBB and Michigan residents arising out of the published contact information.  *Id.*  Indeed, Others First has not alleged that any interaction occurred with residents of *any state* and the BBB based on the contact information listed on the website.  Therefore, personal jurisdiction over the BBB in Michigan "does not exist based on the nature of the website."  *Id.*

Others First argues that the BBB's website is interactive because the BBB uses SEO techniques to continuously republish the press release and to ensure that the website remains at the top of the listings in a Google search.  The court is not persuaded by this argument.  Applying *Zippo*, the proper inquiry is whether the website is "interactive to a degree that reveals specifically intended interaction *with residents of the state*."  *Bird*, 289 F.3d at 874 (internal quotation marks omitted and emphasis added).  Whether the BBB is constantly republishing the press release using SEO techniques is not relevant—nor does it shed any light—on this inquiry.  The BBB's website does not "reveal[] specifically intended interaction with residents" of Michigan.

This case is similar to another recent case in this district which the court finds persuasive.  *Lifestyle Lift Holding Co., Inc. v. Prendiville*, 768 F.Supp.2d 929 (E.D. Mich. 2011) (Cohn, J.).  In *Lifestyle*, the plaintiff Lifestyle Lift Holding Company ("LLH"), a Michigan cosmetic surgery practice that operated nationwide including five locations in Florida, held a trademark for the mark "Lifestyle Lift," which "identifies a cosmetic surgery procedure that LLH uses at its several locations across the United States."  *Id.* at 931.  The defendant, Stephen Prendiville, a plastic surgeon practicing in Fort Myers, Florida, directly

competed with LLH in Florida. *Id.* Prendiville operated two websites in which he posted multiple messages calling into question the Lifestyle Lift. *Id.* at 932. LLH brought suit against Prendiville in Michigan alleging trademark violations, defamation and tortious interference. *Id.* Prendiville challenged the court's personal jurisdiction over him.

The court determined that it lacked personal jurisdiction. First applying the *Zippo* sliding scale test, the court noted that Prendiville's web page permitted users to email him to ask questions and inquire about services. *Id.* at 935. In addition, the page allowed users to check boxes to receive virtual coupons. *Id.* The court reasoned that the web page "arguably falls into the 'middle ground' category of website interactivity" because it "permits the exchange of information between Prendiville and potential customers and he uses it to advertise his services." *Id.* However, this was not enough to allow for personal jurisdiction over Prendiville because "there is no assertion, or evidence, that Prendiville has used the page to make a single sale in Michigan or any other state." *Id.* Like *Lifestyle*, although the BBB's website arguably falls in the "middle ground" category of website interactivity, there are no allegations by Others First that anyone in Michigan has used the website to contact the BBB about Others First. Therefore, as explained above, the court does not have personal jurisdiction over the BBB under the *Zippo* sliding scale test.

The *Lifestyle* court next applied the *Calder* effects test to consider whether there was (1) an intentional act; (2) expressly aimed at the forum state (Michigan); and (3) whether the "brunt of the injury" was felt in Michigan. Although the court stated that the alleged acts were intentional, satisfying the first part of the test, the court reasoned that Prendiville's website postings were not expressly aimed at Michigan. *Id.* at 937–38. The court looked at LLH's web page, where it marketed itself nationally, as opposed to identifying itself as

a Michigan company. *Id.* at 938. Without showing "something more," the court stated that "it cannot be said that Prendiville was targeting LLH in Michigan any more than any other state which has a Lifestyle Lift location." *Id.* at 939. Finally, the court considered where the brunt of the injury was felt, concluding that it was more likely that the brunt of any injury was felt in Florida, where Prendiville competes with LLH's locations. *Id.*

Here, the BBB's website posting was not expressly aimed at Michigan. It was expressly aimed at consumers in St. Louis. Like the plaintiff in *Lifestyle*, Others First markets itself in multiple different states as opposed to identifying itself as a Michigan company. Others First has not met its burden in showing that the BBB targeted Others First in Michigan. Indeed, the website posting appears to be targeting Others First in St. Louis. Relatedly, the brunt of the injury more likely was suffered in St. Louis, the market in which Others First had recently entered, which is the subject of the press release.

### B. Relatedness

Even assuming Others First established purposeful availment, "[t]o satisfy the 'arising from' prong of the *Southern Machine* test, the plaintiff must demonstrate a causal nexus between the defendant's contacts with the forum state and the plaintiff's alleged cause of action." *Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 506–07 (6th Cir. 2014) (citation omitted). In order for the cause of action to "arise from" the defendant's actions in the forum state, the operative facts of the controversy must be related to the defendant's contact with the state. *Id.* at 507. "[T]he plaintiff's cause of action must be proximately caused by the defendant's contacts with the forum state." *Id.* at 507–08.

Here, Others First has failed to show that the operative facts of the controversy are related to the BBB's contact with Michigan or that any of the causes of action have a substantial connection to Others First's activities in Michigan. Indeed, the phone calls and e-mails to Michigan residents prior to the posting of the press release constitute the only contact the BBB had with the state. Others First's alleged causes of action do not arise from these contacts, but from the subsequent posting of the press release. The alleged causes of action do not arise out of any contact the BBB had with the state of Michigan, and, therefore, do not "arise from" the BBB's contact with the state of Michigan.

**C. Reasonableness**

The last consideration is whether the court's exercise of jurisdiction over the BBB would be reasonable. This requires considering (1) the burden on the defendant; (2) the interests of the forum state; and (3) the plaintiff's interests in obtaining relief." *Beydoun*, 768 F.3d at 508 (citing *Asahi Metal Indus. Co. v. Super. Court of Cal.*, 480 U.S. 102, 113 (1987)). Although Others First may have an interest in obtaining relief, the remaining two factors weigh heavily against exercising jurisdiction. The BBB, a Missouri non-profit organization, would be burdened by having to travel to Michigan to defend this lawsuit. None of the relevant events alleged in the lawsuit have a connection to Michigan. There is simply no interest in Michigan aside from the fact that Others First is a Michigan non-profit corporation. It would be unreasonable for the court to exercise jurisdiction over the BBB on this basis alone.

Where a plaintiff fails to establish purposeful availment, it is unnecessary to consider the remaining two elements, because failure to meet one element means that personal jurisdiction may not be invoked. *See, Inc. v. Imago Eyewear Pty, Ltd.*, 167 F. App'x 518,

523 (6th Cir. 2006) (citing *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1303 (6th Cir. 1989). Nevertheless, as explained above, Others First has failed to establish any of the elements. Therefore, the court cannot exercise personal jurisdiction over the BBB without offending traditional notions of fair play and substantial justice. *Int'l Shoe*, 326 U.S. at 316. The court will grant the BBB's motion to dismiss and dismiss the action without prejudice. *See Intera Corp. v. Henderson*, 428 F.3d 605, 620–21 (6th Cir. 2005) (explaining that dismissal for lack of personal jurisdiction does not operate as adjudication on the merits, and, therefore, must be without prejudice).

### III. Transfer Pursuant To 28 U.S.C. § 1404(a)

Given the court's determination above, the court lacks jurisdiction to transfer to the Eastern District of Missouri pursuant to 28 U.S.C. § 1404(a). The BBB's alternative relief, therefore, is moot.

### CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is GRANTED and this case is DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: November 17, 2014

                                            s/George Caram Steeh
                                            GEORGE CARAM STEEH
                                            UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on November 17, 2014, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk